IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

JASON CAMPBELL,

                  Defendant.

CRIMINAL ACTION
NO. 23-141

## OPINION

**Slomsky, J.**                                                    **May 10, 2024**

## I.    INTRODUCTION

In this case, Defendant Jason Campbell ("Defendant") is charged in a two count Indictment with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1)[1] and possession with intent to distribute marijuana for remuneration, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D).[2]

---

[1] 18 U.S.C. § 922(g)(1) provides:

    (g) It shall be unlawful for any person—

    (1) who has been convicted in any court of, a crime punishable by imprisonment
       for a term exceeding one year…

   to ship or transport in interstate or foreign commerce, or possess in or affecting
   commerce, any firearm or ammunition; or to receive any firearm or ammunition
   which has been shipped or transported in interstate or foreign commerce.

[2]  21 U.S.C. § 841(a)(1) provides:

   (a) Unlawful acts
   Except as authorized by this subchapter, it shall be unlawful for any person knowingly or
   intentionally—

    (1) to manufacture, distribute, or dispense, or possess with intent to manufacture,
      distribute, or dispense, a controlled substance . . .

(Doc. No. 1.)  These charges arose from a recorded video call between Defendant and a person incarcerated at a Pennsylvania correctional institution.  In the video, Defendant displays firearms and marijuana in his possession.  (See Doc. No. 30 at 2.)

Based upon the recorded video call, search warrants were sought for Defendant's residence and vehicles, supported by affidavits of probable cause.  (See id. at 6.)  The affidavits of probable cause were submitted by Special Agent Andrea Guse, a Special Agent with the Pennsylvania Attorney General's Office.  (See id.)  The affidavits led to the issuance of search warrants by a duly authorized Magistrate Judge for the search of Defendant's residence at Greene Street in Philadelphia and his two vehicles.  (See id.)  The warrants permitted the seizure of firearms, ammunition, narcotics, United States currency, and other illegal contraband.  (See id.)   The affidavit of probable cause for the search of the residence states in full:

> On Wednesday, January 25, 2023 at approximately 1430 hours, Pennsylvania Office of Attorney General (PAOAG) Special Agent Andrea Guse (hereinafter "SA Guse") was contacted by the Pennsylvania Office of Attorney General Task Force Officer John Murphy (hereinafter "TFO Murphy").  TFO Murphy provided SA Guse with an audio and video-recorded inmate video visit from the PA Department of Corrections. The video is dated and timestamped, Friday January 20, 2023, beginning at 1325 hours. The inmate who made the video call, [sic] the video is Ricardo HARRISON (hereinafter "HARRISON") who is currently incarcerated at SCI-Benner Township, serving a 25 year-57 year sentence for Murder, firearms and PWID convictions.
>
> Approximately 13:07 into the video call, CAMPBELL joins in the call. CAMPBELL stated he is in "the condo."  CAMPBELL told HARRISON he is "counting some cheese, my favorite hobby."  Your Affiant knows "cheese" as a slang term to refer to money. CAMPBELL said he needs to find the key to the safe and then he will show HARRISON "something." Your Affiant observed CAMPBELL walk into a bedroom, open a safe, remove a clear bag and pour the contents onto bed.  The contents of the bag were bundled one hundred dollar bills, referred to as bands," as captured in the following screenshot: [screenshot depicts multiple bundles of United States Currency laying on a bed].

CAMPBELL stated "ain't no twenties and tens in these jawns either." CAMPBELL told HARRISON to "tell them bouts in there like you be talking to some heavy hitters, we ain't playing no games."

At 15:38 into the video call, HARRISON asked CAMPBELL if his wife was at home.  CAMPBELL replied "no ain't nobody here. I'm in the city, I'm in the condo [. . .]"

At 18:52 into the video call, CAMPBELL told HARRISON "this is what we keep in the city. In the city a man has different flavors." CAMPBELL then showed numerous designer shoes in boxes, along with designer colognes he stated he uses. Your Affiant noticed men's clothing throughout this bedroom as well.

At 20:36, CAMPBELL told HARRISON that he "has something else before I forget," produced a black Taurus firearm, and placed it onto the bed. HARRISON replied "oh yeah." CAMPBELL then told HARRISON "that ain't nothing, that's something light" and then walked to another part of the bedroom and said "hold on." CAMPBELL bent down and stood back up with two black firearms both with seated magazines, one in each hand, as captured in the below screenshot: [screenshot depicts Defendant holding two firearms close to the camera screen].

HARRISON asked "what number is that?" to which CAMPBELL replied,  "Gen 5, 23 right here." Your Affiant knows that a "Gen 5 23" refers to a Glock 23 Gen 5 which is a .40 caliber semiautomatic handgun.  HARRISON asked, "What's that one?" in reference to the second handgun, to which CAMPBELL replied "PPQ 40 caliber." Your Affiant knows that a "PPQ" refers to a Walther PPQ which is a .40 caliber semiautomatic handgun. CAMPBELL then moved both black handguns into his left hand and bent down again. CAMPBELL then produced a beige and black Taurus handgun with seated magazine. [screenshot depicts Defendant with another firearm close to the camera screen].

CAMPBELL then put the three firearms down and walked out of the bedroom into what appeared  to be a living area. CAMPBELL approached  a gray sofa and lifted up a cushion to reveal a Hipoint firearm, as captured  below. [screenshot depicts a cushion lifted to reveal a firearm].

Your Affiant identified this firearm as a HiPoint model JCP which is a .40 caliber semiautomatic handgun CAMPBELL then picked up the firearm and put it on top of the cushion and stated "pound." CAMPBELL described this firearm as "ugly but she nice as shit. Big as shit. That jawn shoot anything, she don't jam or anything. I ain't playing,  I ain't even pull out the extendo, that shit tucked in the bag."

CAMPBELL then returned into the bedroom and showed off the three firearms he had earlier.  HARRISON asked in particular about the PPQ, asking how much it holds. CAMPBELL removed  the magazine from the firearm and stated "oh yeah it hold 15."

CAMPBELL then showed the magazine up close to the camera and said "see what's in there?" HARRISON replied "hollows. That's heavy." CAMPBELL then stated "if I go back up there, I am taking a few with me." Your Affiant can clearly see the tips of hollow point ammunition seated inside the magazine when CAMPBELL focuses the camera on the magazine.

At 28:00, into the video call, HARRISON stated, "that shit was heavy. Yo, that's heavy. That's a heavy collection." CAMPBELL said, "that ain't even, I ain't even show you, I got . . . I don't know some this stuff, I be having so much stuff." HARRISON asked "what's that going for a stack or better?" CAMPBELL replied "for sure." Your Affiant knows "stack" to be slang for $1,000. CAMPBELL then opened up a black storage tote with a yellow lid. CAMPBELL moved some clothing on top and removed a plastic bag. CAMPBELL removed a black and silver firearm from the plastic bag and stated "this a little pocket rocket to carry with you, it's a 9.Taurus," as captured below: [screenshot depicts a firearm].

Your Affiant knows that Taurus to be a manufacturer of firearms.

At 29:36 into the video call, CAMPBELL stated "I'm about to leave out. Take my ass outside". CAMPBELL walked throughout the apartment to the front door. Your Affiant notes that CAMPBELL appears to be the only occupant of this apartment at the time of the video call. When CAMPBELL exited the front door of the apartment and entered the hallway of the apartment complex, Your Affiant can hear the jangle of keys and then clearly see the door to the apartment immediately across from CAMPBELL is marked as "405."

At 31:30, into the video call, CAMPBELL stated he had just gotten off the elevator and is now observed outside. Your Affiant notes that the apartment complex in the background of CAMPBELL, at this time, is labeled with a sign, "Greene Manor Apartments," 6350 Greene Street, Philadelphia, PA 19144. CAMPBELL stated to HARRISON "you see my baby" and then shows him his black Chevy Tahoe that is parked on the street- consistent in make, model and color to the Chevrolet Tahoe registered to CAMPBELL. CAMPBELL opened the driver's side front door and entered into the Chevy Tahoe.

At 37:59 into the video call, CAMPBELL, still seated inside the Chevy Tahoe, showed a clear bag of a green leafy substance, consistent with the appearance of marijuana. CAMPBELL stated, "I got it double sealed." CAMPBELL then showed himself pushing a single button underneath the vehicle's Infotainment screen/system. Once the button is depressed, the Infotainment screen/system raises, revealing a natural void.

4

At the 49:00 minute mark of the call, CAMPBELL stated he is driving on "Pleasant." CAMPBELL told HARRISON that his truck is parked on this block. CAMPBELL passed by a blue Dodge truck and stated this is his truck- consistent in make, model and color to the Dodge Ram registered to CAMPBELL. HARRISON asks if CAMPBELL ever drives it, CAMPBELL replies "nah not really. Trying to think, do I have the jawn in there? I mean, there be some stuff sitting in there." The video call then ends, Given CAMPBELL's prior use of the word "jawn" to describe his firearm and the revelation of the hidden compartment in his Chevy Tahoe, your Affiant believes this statement is in reference to firearms or narcotics.

On Thursday, January 26, 2023, Parole Supervisor Mark Carey (hereinafter "Sup Carey") and Task Force Officer Calvin Monroe (hereinafter "TFO Monroe") conducted  surveillance around Greene Manor apartments, 6350 Greene Street, Philadelphia, PA 19144. At approximately  1117 hours, they located a black Chevy Tahoe, parked near the intersection of Greene Street and Johnson Street, approximately  500 feet from  the front door of the Greene Manor Apartments, bearing PA registration RR.6P26. A check of PennDOT vehicle registration shows that this vehicle is owned by and registered to Jason Campbell, 6350 Greene Street, Apartment 404, Philadelphia, PA 19144.

Supervisor Carey and TFO Monroe then went to the unit block of E. Pleasant Street, and located the blue Dodge truck CAMPBELL showed in the video, parked in the approximate location of where CAMPBELL showed in the video call.  A PennDOT vehicle registration shows that this vehicle is owned by and registered to Jason Campbell[,] 23 E. Pleasant Street, Philadelphia, PA 19119.

Firearms are durable goods that are generally kept over the long term and are routinely stored in one's own residence and/or vehicle. The fact that CAMPBELL is prohibited from purchasing, possessing, using firearms strengthens your Affiant's belief that CAMPBELL would retain possession of any and all firearms illegally obtained. From your Affiant's prior experience, parolees will keep firearms and other illegal items in residences that are not approved by parole, due to the fact that parole approved residences can be search at any time by parole agents.

Your Affiant is requesting the approval of this search warrant to search 6350 Greene Street, Apartment 404, Philadelphia, PA 19144, for any and all firearms, firearm related material, ammunition, firearm paperwork, proof of residency, cell phones, narcotics, safes and any contents of, US currency, and any and all illegal contraband.

(Doc. No. 30-2 at 1-8.)  Similar affidavits of probable cause were submitted by Agent Guse for warrants to search the Chevy Tahoe and the blue Dodge Ram truck.  Screenshots from the videos showing Defendant holding firearms and displaying United States currency were included in the affidavits of probable cause.  (See Doc. No. 30-2.)  The affidavits were sworn to by Agent Guse.  (See id.)  The search warrants were issued by Philadelphia County Magistrate Judge Lauren Connor.  (See id.)

On January 27, 2023, the officers executed the search warrants and recovered from the residence seven (7) firearms and ammunition, and from the blue Dodge Ram truck, 454 grams of marijuana.  (See id. at 7.)  On April 5, 2023, Defendant was indicted and charged with (1) possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), and (2) possession with intent to distribute marijuana for remuneration, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D).  (Doc. No. 1.)

Before the Court is Defendant's Motion to Suppress Evidence seized from his residence and vehicle, his statements recorded on the video, and other items.  (Doc. No. 21.)  In support of the Motion, Defendant contends that: (1) "prior to his arrest, audio and video recordings were made of Mr. Campbell without his knowledge or consent," (2) "his person, email accounts and internet storage services, vehicle, gun, or any other alleged contraband in question were . . . seized without a search and seizure warrant and without the existence of exigent circumstances, reasonable suspicion, or probable cause," (3) "the warrant did not particularly describe the place or persons to be searched or the items of evidence to be seized and did not set forth probable cause for its issuance or for a search," and (4) "the search warrant contained false and misleading information without which probable cause its issuance would not have existed."  (Id. at 2.)

More specifically, regarding the recorded calls, Defendant argues that "prior to [his] arrest, [he] made statements that were recorded without his knowledge or consent" and "before the statements were made, [Defendant] was not warned of nor did he waive his right to counsel and his right to remain silent." (Id. at 4.)

The Government filed a Response in Opposition, submitting that the searches and seizures were lawful. (Doc. No. 30.) First, the Government submits that Defendant did not have a reasonable expectation of privacy in the recorded video call with the person incarcerated. (See id. at 7.) Second, the Government asserts that the search warrants were supported by probable cause. (See id. at 8.) Third, in the alternative, the Government argues that even if the Court disagrees and finds the warrants were not supported by probable cause, the good faith exception applies.[3] (See id.) Defendant filed a Reply essentially arguing again that he did not consent to the recording of the video call with the person incarcerated. (See Doc. No. 32.) Additionally, following the evidentiary hearing held on March 8, 2024, both Defendant and the Government filed supplemental responses based upon the evidence presented at the hearing. (Doc. Nos. 45, 46.)

## II.   FINDINGS OF FACT

On March 8, 2024, an evidentiary hearing was held on the Motion to Suppress Evidence. (Doc. No. 43.) Two witnesses testified: (1) Investigative Analyst Josh Graubard ("Graubard") of the Pennsylvania Department of Corrections,[4] and (2) Special Agent Andrea Guse ("Guse") of the

---

[3] If an officer acting with objective good faith obtains a search warrant from a magistrate judge and acts within the scope of that warrant, the evidence seized is admissible at trial under the good faith exception to the Fourth Amendment, despite lack of probable cause to support the issuance of the warrant. See United States v. Leon, 468 U.S. 897 (1984); see also United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993). Because the search warrants were supported by affidavits with probable cause, there is no need to make findings on the good faith exception.

[4] Analyst Graubard was employed with the Pennsylvania Department of Corrections as an Intelligence Analyst. (See Doc. No. 43 at 6.) He described his role as follows:

Pennsylvania Office of the Attorney General.[5]  (See id.)  Both witnesses were involved in the investigation of the recorded video call between Defendant and inmate Ricardo Harrison.  In addition, during the suppression hearing, the Government played a portion of the recorded video.  (See id.)  The following facts were adduced at the hearing.

### A. Testimony of Investigative Analyst Graubard Concerning Procedure for Recording a Video Call at Pennsylvania State Correctional Institutions

First, Investigative Analyst Graubard testified regarding the general procedure for setting up and recording a video call at State Correctional Institutions in Pennsylvania.  (See Doc. No. 43 at 7-25.)  Next, he testified regarding how those general procedures were followed when setting up and recording the video visit between Defendant and inmate Ricardo Harrison.  (See id.)

1. Testimony Concerning the General Procedure for Recording a Video Call

Graubard said that when setting up a video visit with an inmate, approved visitors must follow a set of steps including registration and scheduling.  (See id. at 13-25.)  First, prior to the video visit, the approved visitor is notified that the call will be recorded on the Pennsylvania Department of Corrections ("PA DOC") website.  (See id. at 17.)  On the website, a "Visitor's Guide," which is located under a section titled "Visiting Rules," which is part of a larger section titled "For Family and Friends," explains that video visits are recorded.  (See id. at 16-17.)

_____

my job is to analyze information from our jails as well as . . . our parole population . . . for anything that would cause a risk to our facilities, to any of our staff . . .

(Id. at 7.)

[5] Agent Guse worked as a Special Agent with the Pennsylvania Office of Attorney General for a year and a half.  (See Doc. No. 43 at 63-64.)  Her duties "range[d] from investigating crimes involving firearms, straw purchases, felons not to possess firearms and such in Philadelphia."  (Id. at 64.)  Prior to this position, Guse worked as a parole agent with the Pennsylvania Department of Corrections for six years.  (See id.)

The Visitor's Guide further explains that visits are scheduled online at https://inmatevisitation.cor.pa.gov.  (See id. at 13-14.)  To schedule a video visit, a person must register at the above website and create an account.  (See id.)  To create an account, a visitor must provide a valid name, date of birth, address, and valid email address.  (See id. at 14.)  Each registrant's information is verified.  (See id.)

Graubard further testified that following the creation of an account, a visitor may schedule a video visit on the "Inmate Visitation System" webpage.  (See id. at 16-17.)  During registration with the "Inmate Visitation System" and any subsequent sign-in to the system to schedule a visit, the following message is given: "All video visits with non-attorneys are audio/video recorded and subject to review."  (Id. at 16.)  Additionally, to schedule a video visit, a user must respond to a required question with a "yes" or "no" answer: "I acknowledge that I am aware all non-attorney video visits are recorded (audio/video) and subject to review by PA DOC."  (Id. at 17.)  If the user answers "no" and refuses to acknowledge that the video will be recorded, then the video visit will not be scheduled.  (See id.)  If the user selects "yes," acknowledging that the video will be recorded, a visit can be scheduled.  (See id.)  While parolees are not permitted on the approved visitor list, nothing prevents them from accessing a zoom link to enter a meeting which has already been scheduled.  (See id. at 47.)

To access the scheduled video visit, all users, whether the person who set up the video conference with the inmate or anyone joining the video conference, must launch a Zoom meeting link.  (See id. at 19.)  When entering a scheduled video visit by launching the Zoom meeting link, a "pop-up" window states: "[t]his meeting is being recorded by the host or a participant."  (Id. at 20.)  Following this pop-up window, a user must either select "got it"—permitting them to enter the video visit—or "leave meeting"—which prohibits entry into the video visit.  (Id. at 20-21.)

Therefore, anyone entering a Zoom video visit with an inmate must consent to the visit being recorded.  (Id. at 21-22.)

Graubard noted that after a video visit begins, an additional "pop-up" states that "this meeting is being livestreamed."[6]  (Id. at 21.)  Again, any user must click "got it" to proceed with the livestreamed video visit.  (See id.)  Throughout each video visit, the words "recording" and "livestreaming" are visible at the top of the screen.  (See id.)

> 2. Testimony Concerning the Setup of Defendant's Video Call with Inmate Ricardo Harrison

Graubard further testified that Breia Cooper, an approved visitor, set up a video visit with inmate Ricardo Harrison ("inmate Harrison") at State Correctional Institution-Benner ("SCI Benner") to take place on January 20, 2023.  (Id. at 26.)  On January 20, 2023 at 1:25 p.m., inmate Harrison began the video visit from within SCI Benner.  (Id. at 26, 59.)  At 1:36 p.m., Defendant Jason Campbell ("Defendant") joined the Zoom video visit.  (Id. at 27.)   To join the video visit on Zoom, Defendant was required to check "yes" and acknowledge that the video visit was being recorded.  He also was required to select "got it" when asked to acknowledge that the video visit was being livestreamed, or else he would have been prohibited from entering the Zoom meeting. (Id. at 29-31.)  Additionally, Defendant received notifications that the call was being recorded and livestreamed during the course of the conversation.  (See id. at 23.)

**B. Testimony of Special Agent Guse Concerning Substance of Defendant's Video Call with Pennsylvania State Correctional Institution Inmate**

Special Agent Guse testified about the content of the January 20, 2023 recorded video visit. (Id. at 65-67.)  During the call, Defendant is identified by name on the screen, "Jason Campbell."

---

[6] A "livestreamed" video is one that is streamed over the Internet for live viewing, meaning that "Anyone with access to the livestream can watch or share with others."  (Doc. No. 43 at 22.)

(Id. at 33.)  Guse testified that Defendant is seen on the video moving around an apartment and displaying multiple firearms and a large amount of United States currency.  (See id. at 67.)  In particular, she notes that:

> During the phone call when Mr. Campbell enters . . . he begins speaking with [inmate Harrison] . . . [a]nd he goes throughout the apartment and shows numerous firearms throughout that apartment.  He references many of them by name. He also shows a safe with a significant amount of money inside of it. He then exits the apartment and then enters a car -- a vehicle which we've identified as a Chevy Tahoe and . . . he drives around his neighborhood and also shows [inmate Harrison] . . . another vehicle on a street . . . that belongs to him.

(Id. at 68.)

While in the vehicle, Defendant displays on the video call a clear bag with a green, leafy substance within.  (See Doc. No. 43.)  The substance appears to be marijuana.  Defendant states, "I got it double sealed."  (Id.)  In the video recording, Defendant begins to drive the vehicle and informs inmate Harrison that he is driving on "Pleasant."  (Id. at 71.)  He also notes that he has a truck parked on the block on which he is driving.  (See id.)  Guse testified that Defendant drives by a blue Dodge truck and states that it is his.  (Id.)  When inmate Harrison asks Defendant if he ever drives the blue truck, Defendant states on the recording, "[n]ah not really. Trying to think, do I have the jawn in there? I mean, there be some stuff sitting in there."  (Id.)

### C. Testimony of Special Agent Guse Concerning the Execution of Search Warrants at Defendant's Greene Street Residence and Blue Dodge Vehicle

On January 24, 2023, the PA DOC provided a Supervisory Special Agent in the Office of the Attorney General with the recording of the video call between inmate Harrison and Defendant. (Id. at 64.)  Investigators determined that in the video, Defendant had exited an apartment complex at 6350 Greene Street, Apartment 404, Philadelphia, PA 19144.  (Id. at 72-73.)  In addition, a PennDOT vehicle registration showed a blue Dodge truck, like the one seen in the video recording, was registered to Jason Campbell, 23 E. Pleasant Street, Philadelphia, PA 19119 and it was parked

on the street.  (Id. at 71.)  Two days later, on January 26, 2023, parole officers surveilled the Greene Street Apartments.  (Id. at 73.)  During the surveillance, they located a black Chevy Tahoe owned by and registered to Defendant.  (See id. at 70-75.)

Based upon their observations in the recorded video call and subsequent physical surveillance, the Special Agent obtained the search warrants for the following locations: (1) 6350 Greene Street, Apartment 404, Philadelphia, PA; (2) the black Chevrolet Tahoe; and (3) the blue Dodge Ram truck.  (See id.)  In addition, because Defendant's status as a convicted felon prohibits his possession of firearms, the search warrants sought authority to seize firearms, controlled substances, and United States currency.  (Doc. No. 30-2 at 3.)  On January 26, 2023, the three search warrants were signed by Philadelphia County Magistrate Judge Lauren Connor.  (See Doc. No. 43 at 75.)

The next day, on January 27, 2023, officers from the Philadelphia Police Department executed the search warrant at Greene Street.  (Id. at 76.)  During the execution of the warrant, Defendant was found within the apartment. (See id. at 74.)  In the Greene Street apartment, the officers recovered seven firearms, $57,000 in United States currency, various ammunition rounds, and pistol magazines.  (See id. at 74-75.)  Agents also searched the blue Dodge Ram truck seen in the recorded video call.  (Id. at 76.)  In the blue Dodge Ram truck, agents recovered approximately 454 grams of marijuana.  (See id.)  Since Defendant had a prior conviction for a felony,[7]  Defendant

---

[7] Prior to the instant charged offense, Defendant had been convicted multiple times.  (Doc. No. 23 at 3-4.)  On July 25, 1999, Defendant was arrested for robbery, carjacking, aggravated assault, and violations of the Pennsylvania Uniform Firearms Act.  (See id.)  Following this arrest, Defendant was convicted by a jury in the Philadelphia Court of Common Pleas of (1) robbery, in violation of 18 Pa. Cons. Stat. § 3701, (2) carjacking, in violation of 18 Pa. Cons. Stat. § 3702, (3) conspiracy, in violation of Pa. Cons. Stat. § 903 and (4) fleeing police, in violation of 75 Pa. Cons. Stat. § 3733.  (See id.)  On February 5, 2001, Defendant received a total sentence of five (5) to ten (10) years imprisonment for these convictions.  (See id.)  In addition, on December 25, 1999, Defendant was arrested for murder, robbery, and firearms offenses.  (Id. at 4.)  On July 25,

was arrested and charged with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), and possession with intent to distribute marijuana for remuneration, in violation of 21 U.S.C § 841(a)(1), (b)(1)(D).  (See Doc. No. 1.)

## III.   CONCLUSIONS OF LAW

As noted previously, Defendant contends that there were seizures from him in violation of the Fourth Amendment.  (See Doc. No. 21.)  In particular, Defendant asserts that "prior to his arrest, audio and video recordings were made of [Defendant] without his knowledge or his consent."  (See id. at 2.)  Further, he argues that "his person, email account and internet storage services, vehicle, gun, or any other alleged contraband in question were searched by law enforcement officers . . . in violation of [Defendant's] right to be free from unreasonable search and seizure as guaranteed by the Fourth Amendment of the Constitution of the United States."  (See id.)  Further, Defendant argues that the warrants obtained did not describe with particularity the place or persons to be seized and contained false and misleading information.  (See id.)  As a result, Defendant seeks the suppression of the statements allegedly made by him and tangible evidence seized, including the firearms, ammunition, currency, and marijuana.  (See id. at 2-3.)

---

2001, Defendant pled guilty to (1) third degree murder, in violation of 18 Pa. Cons. Stat. § 2502, and (2) carrying a firearm in public, in violation of 18 Pa. Cons. Stat. § 6106.  (See id.)  Defendant was subsequently sentenced to a term of ten (10) to twenty (20) years imprisonment and ten (10) years' probation.  (See id.)  In this same case, Defendant pled guilty to aggravated assault and was sentenced to twenty (20) years' probation to run consecutive to the sentence imposed for third degree murder and carrying a firearm in public.  (See id.)  Finally, in 2012, during his incarceration in State Correctional Institution Houtzdale ("SCI Houtzdale"), Defendant was arrested for (1) terroristic threats, in violation of 18 Pa. Cons. Stat. § 2706, (2) introducing a weapon that may be used to escape, in violation of 18 Pa. Cons. Stat. § 5102, and (3) contraband-possession of a telecom device by an inmate, in violation of 18 Pa. Cons. Stat. § 5123.  (See id.)  On February 11, 2013, in Clearfield County Court of Common Pleas, Defendant pled guilty to all three charges and was sentenced to a term of imprisonment of two (2) to four (4) years.  (See id.)

### A. Defendant Had No Reasonable Expectation of Privacy in Phone Calls With an Incarcerated Person

Defendant argues that he had a reasonable expectation of privacy during the video visit with inmate Harrison because "he did not receive any warnings that he was being monitored." (Doc. No. 32 at 4.)  For this reason, Defendant contends that the recorded video visit should be suppressed, as well as any evidence obtained from the execution of the search warrants following the video visit.  (Id.)

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. AMEND. IV. It provides that this right "shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Id.  Specifically, the Fourth Amendment protects property or information in which a person has a "reasonable expectation of privacy."  United States v. Shavers, 693 F.3d 363, 389 (3d Cir. 2012) (citing New York v. Class, 475 U.S. 106, 112 (1986)).  "This requires the defendant to subjectively believe the information is private and for that belief to be objectively reasonable."  United States v. Jarmon, 14 F.4th 268, 272 (3d Cir. 2021) (quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).  Without a reasonable expectation of privacy in the place searched or the items seized, there is no Fourth Amendment violation, and the items seized will not be suppressed.

The Third Circuit Court of Appeals has held that an individual receiving a phone call from a prison has no reasonable expectation of privacy on the phone call.  See Jarmon, 14 F.4th at 272; see also Shavers, 693 F.3d at 389-90.  For example, in Jarmon, government agents listened to recordings of the defendants' phone conversations made while one defendant was in prison. 14 F.4th at 270.  Following an investigation which included phone conversation surveillance, the

defendants were indicted and convicted of conspiracy and related charges.  See id. at 271.  On appeal, the defendants challenged the trial court's denial of their motion to suppress recordings of phone calls made while a defendant was incarcerated.  See id.  The Third Circuit held that just like inmates, parties on the line during recorded phone calls with inmates have no reasonable expectation of privacy "if they have reason to know their calls are being monitored."  Id.  In so holding, the court opined that:

> Prisoners know they are under constant surveillance. They have no general expectation of privacy during their incarceration, including in their own cells.  And the prison's phone policies and warnings to inmates make any subjective expectation of privacy even more unreasonable. That principle applies to both parties on the line.  A party at liberty . . . cannot reasonably expect his call to be private when he is told that his conversation with an inmate . . . is being monitored.

Id. at 272 (citations omitted).  Because the party on the line "assumed the risk of surveillance" and discussed criminal acts during the conversation despite being informed that the call was being monitored, the court held that neither party on the line had any reasonable expectation of privacy in their recorded phone conversations.  Id. at 272.

Likewise in Shavers, the Third Circuit also affirmed the denial of a Motion to Suppress on similar grounds.  693 F.3d at 390-91.  The defendant in Shavers challenged the denial of a motion to suppress a phone conversation recorded at the prison.  See id. at 389.  Because the defendant who called the inmate "knew where [the inmate] was incarcerated," "was previously incarcerated at the same prison," the court held that the defendant "should have known that all outgoing prisoner telephone calls were monitored and recorded."  Id. at 390.  Thus, the court held that the defendant had no reasonable expectation of privacy on the recorded telephone call with the inmate.  See id.; see also United States v. Sababu, 891 F.2d 1308, 1329 (7th Cir. 1989) (holding that non-prisoner had no reasonable expectation of privacy because he was "well aware of the strict security measures in place"); United States v. Harrison, 986 F. Supp. 280, 281-82 (M.D. Pa. 1997) (finding

that the defendant had no reasonable expectation of privacy because it was clear from the substance of his call that he understood he was being monitored).

Here, Defendant Campbell had no reasonable expectation of privacy on the phone with inmate Ricardo Harrison.  First, when Defendant accessed the Zoom link for the video visit, he was required to acknowledge that his visit would be recorded.  (See Doc. No. 43 at 21-22.)  Second, throughout the video visit, the screen shows that the call is being recorded and livestreamed.  (See id.)  For this reason, like the defendants in Jarmon and Shaver, Defendant had no reasonable expectation of privacy in the video phone calls with inmate Ricardo Harrison because he knew the call was being recorded.  Despite the notification and acknowledgment, Defendant chose to display firearms and marijuana which he could not legally possess while speaking with inmate Harrison on the recorded video visit.  In addition, like the defendant in Shaver who was previously incarcerated and should have known that calls were being recorded, Defendant also was on parole at the time of the call and had prior incarcerations at state institutions in Pennsylvania, and therefore would be familiar with video calls being recorded in prison.  Accordingly, the recorded video call will not be suppressed.[8]

### B. Search Warrants Were Supported by Probable Cause

Next, Defendant argues that the items were seized from his residence and vehicle in violation of the Fourth Amendment because the search warrants were not supported by probable cause set forth in a sworn affidavit.  (See Doc. No. 21.)  In the alternative, Defendant contends that the warrants did not describe with particularity the place or persons to be searched or evidence to

---

[8] Because Defendant had no expectation of privacy in the video calls with Harrison, there was no need for the authorities to secure a search warrant prior to watching them.  To the extent Defendant is arguing that evidence was seized in violation of the Fourth Amendment without first obtaining a warrant, this argument is unpersuasive.

be seized."  (See id.)[9]  Defendant also requests that any evidence or contraband recovered based on the above warrants be suppressed because they were obtained based on the illegally recorded video visit.  (See id.)  However, this latter argument fails because, for the reasons explained above, the video visit was not illegally recorded.

As noted previously, the Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. AMEND. IV.  It provides that this right "shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Id.  "[T]he ultimate measure of the constitutionality of a governmental search is reasonableness[.]"  Maryland v. King, 569 U.S. 435, 447 (2013).  For a search and seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant from a neutral magistrate judge based on probable cause.  See United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002); see also Treasury Employees v. Von Raab, 489 U.S. 656, 667 (1989).

Probable cause is established if there is a fair probability that contraband or evidence of a crime will be found in a particular place and is based on the "totality of the circumstances" available at the time of the search.  Gomez v. Markley, 385 Fed. Appx. 79, 82-83 (3d Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 235 (1983)).  In approving or denying an application for a search warrant, "the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there

---

[9] This argument fails because the affidavit to search the residence specifically described the premises to be searched as: "6350 Greene Street, Apt. 404, Philadelphia, PA 19144."  (Doc. No. 30-2 at 1.)  The two search warrants described the vehicles to be searched as: "2003 Dodge Ram bearing PA Registration ZPA-8480/VIN 1D7HU18N03S297556" and "2018 Chevrolet Tahoe PA [R]egistration 446P26."  (Doc. No. 30-3 at 1-2.)

is a fair probability that contraband or evidence of a crime will be found in a particular place."
United States v. Wright, No. CR 19-230, 2021 WL 4552282, at *5 (E.D. Pa. Oct. 5, 2021)
(quoting Gates, 462 U.S. at 238).  Because "reasonable minds frequently may differ on the
question of whether a particular affidavit establishes probable cause," the United States Supreme
Court has "concluded that the preference for warrants is most appropriately effectuated by
according 'great deference' to a magistrate's determination."  United States v. Leon, 468 U.S. 897,
914 (1984).

Here, the three search warrants were issued based on probable cause.  The sworn affidavits
described, among other things, the following events: (1) Defendant's possession of multiple
firearms; (2) Defendant's possession of an excessive amount of United States currency in bundled
one-hundred dollar bills; (3) the observation of officers that Defendant exited an apartment
complex located on Greene Street in Philadelphia; (4) Defendant's display of a bag of leafy green
substance bearing the appearance of marijuana; (5) Defendant's description of "the jawn" located
within his parked vehicle, and (6) his ownership and registration in his name of the two vehicles.

At the time of the recorded video call, Defendant was on parole having been convicted of
multiple violent crimes, as set forth supra.  On the recorded video visit, agents viewed Defendant
displaying possession of multiple firearms, currency, and controlled substances both at his Greene
Street residence and in his vehicle.  In the affidavits supporting the application for search warrants,
the agent cited to direct evidence of criminal activity, including the observation on the recording
of Defendant possessing multiple firearms and displaying a significant amount of bundled one
hundred dollar bills and a "clear bag of green leafy substance."  (See Doc. No. 30-2.)  For example,
the affidavit noted that:

At 20:36, CAMPBELL told HARRISON that he "has something else before I forget," produced a black Taurus firearm, and placed it onto the bed. HARRISON replied, "oh yeah." CAMPBELL then told HARRISON "that ain't nothing, that's something light" and then walked to another part of the bedroom and said "hold on." CAMPBELL bent down and stood back up with two black firearms both with seated magazines, one in each hand, as captured in the below screenshot: [screenshot depicts Defendant holding two firearms close to the camera screen].

HARRISON asked "what number is that?" to which CAMPBELL replied, "Gen 5, 23 right here." Your Affiant knows that a "Gen 5 23" refers to a Glock 23 Gen 5 which is a .40 caliber semiautomatic handgun. HARRISON asked, "What's that one?" in reference to the second handgun, to which CAMPBELL replied "PPQ 40 caliber." Your Affiant knows that a "PPQ" refers to a Walther PPQ which is a .40 caliber semiautomatic handgun. CAMPBELL then moved both black handguns into his left hand and bent down again. CAMPBELL then produced a beige and black Taurus handgun with seated magazine. [screenshot depicts Defendant with another firearm close to the camera screen].

CAMPBELL then put the three firearms down and walked out of the bedroom into what appeared to be a living area. CAMPBELL approached a gray sofa and lifted up a cushion to reveal a Hipoint firearm, as captured below. [screenshot depicts a cushion lifted to reveal a firearm].

Your Affiant identified this firearm as a HiPoint model JCP which is a .40 caliber semiautomatic handgun CAMPBELL then picked up the firearm and put it on top of the cushion and stated "pound." CAMPBELL described this firearm as "ugly but she nice as shit. Big as shit. That jawn shoot anything, she don't jam or anything. I ain't playing, I ain't even pull out the extendo, that shit tucked in the bag."

CAMPBELL then returned into the bedroom and showed off the three firearms he had earlier. HARRISON asked in particular about the PPQ, asking how much it holds. CAMPBELL removed the magazine from the firearm and stated "oh yeah it hold 15." CAMPBELL then showed the magazine up close to the camera and said "see what's in there?" HARRISON replied "hollows. That's heavy." CAMPBELL then stated "if I go back up there, I am taking a few with me." Your Affiant can clearly see the tips of hollow point ammunition seated inside the magazine when CAMPBELL focuses the camera on the magazine.

(Doc. No. 30-2 at 1-8.)

Here, based upon the direct evidence of criminal activity specified in the affidavits, the

Magistrate Judge made a "common-sense decision" that there was a "fair probability" that

contraband or evidence of a crime would be found in the Greene Street residence and Defendant's vehicles.  The totality of this information as set forth in the affidavit of Agent Guse provided the Magistrate Judge with a substantial basis to issue the warrants for Greene Street and Defendant's vehicles.  And the video evidence of firearm, currency, and illegal substance possession gave rise to probable cause to conduct the search of Defendant's residence at Greene Street and vehicle.  Finally, Defendant has not presented any evidence that the affidavits contained false or misleading information.  Accordingly, the Magistrate Judge had substantial basis based on the evidence set forth in the affidavits to conclude that probable cause existed for the searches.

### C.  Defendant's Statements will not be Suppressed

Defendant also asserts that his post-arrest statements should be suppressed.  (See Doc. No. 21.)  Defendant contends that "after [his] arrest, and while he was in custody, [Defendant] made statements in response to questioning by law enforcement officers which the Commonwealth intends to use against him at . . . trial."  (See id.)  Defendant also argues that "before the statements were made, [Defendant] was not warned of nor did he waive his right to counsel and his right to remain silent."  (Id. at 4.)

But Defendant has not identified any statements that were made following his arrest.  Additionally, at the evidentiary hearing, no such statements were identified.  Without more, any statements made by Defendant following his arrest will not be suppressed.  In addition, no emails or internet storage services were identified at the evidentiary hearing on the Motion to Suppress Evidence or even the subject of testimony.  For this reason, and without more, these items too will not be suppressed.

**IV.    CONCLUSION**

For all the foregoing reasons, Defendant's Motion to Suppress (Doc. No. 21) will be denied.  An appropriate Order follows.